IRVING COHEN
233 Broadway, Suite 2701
New York, New York 10279
(212) 964-2544
Attorney for Plaintiffs
(IC 3708)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

RAYMOND RIVERA, and MINERVA VENTURA

                      Plaintiffs,

CITY OF NEW YORK, DET.  DAVID BAILEY, DET.
JOHN MCCLURE, Off.  EDWIN FELICIANO, POLICE
OFFICERS FOR THE CITY OF NEW YORK,
INDIVIDUALLY AND AS POLICE OFFICERS FOR
THE CITY OF NEW YORK,
                      Defendants
------------------------------------------------------------------------- x

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

12 CV

## INTRODUCTION

1. This is an action for damages for the wrongful acts of defendants NEW YORK CITY and

DET. DAVID BAILEY, Det. JOHN MCCLURE and OFF. EDWIN FELICIANO of the New York

City Department, all acting under color of state law and pursuant to their authority, in violation of

plaintiffs' rights under the Constitution and laws of the United States and the State of New York.

2. Plaintiffs allege that beginning on or about June 24, 2011, defendants committed wrongful

and illegal acts against Plaintiffs including assaulting them, falsely arresting them and imprisoning

them, maliciously prosecuting them, damaging their reputations, damaging and causing loss of their

property, and violating their Federal and New York State civil rights.

## JURISDICTION

3. This action is brought under 42 U.S.C. Section 1983 in conjunction with the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and the constitutional, statutory and common laws of New York State.

4. Jurisdiction is invoked herein pursuant to the aforementioned statutory and constitutional provisions and pursuant to 28 U.S.C. Section 1331 and 1343, this being an action seeking redress for the violation of the plaintiffs' constitutional and civil rights.

5. Plaintiffs further invoke this Court's pendant jurisdiction over any and all state law claims and causes of action which derive from the same nucleus of operative facts that give rise to the federally based claims and causes of action, pursuant to Title 28, U.S.C. section 1367.

6. Venue is laid within the United States District Court for the Southern District of New York in that the actions complained of occurred in the Southern District of Ne w York.

## TRIAL BY JURY

7. Plaintiffs demand a trial by jury on each and every one of their claims as pled herein.

## PARTIES

8. At all times relevant hereto, plaintiffs RAYMOND RIVERA and MINERVA VENTURA, are and were residents of the Bronx, New York; and are husband and wife.

9. At all times relevant hereto, defendant NEW YORK CITY was and is a municipality of the State of New York and owns, operates, manages, directs and controls the New York City Police Department, which employs the other names defendants.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

2

10.  Defendant DAVID BAILEY is and was at all times relevant to this action a police detective, employed by the New York City Police Department, and acting under color of state law. He is being sued in both his individual and official capacities.

11.  Defendant JOHN MCCLURE is and was at all times relevant to this action a police detective, employed by the New York City Police Department, and acting under color of state law. He is being sued in both his individual and official capacities.

12. . Defendant EDWIN FELICIANO is and was at all times relevant to this action a police officer, employed by the New York City Police Department, and acting under color of state law. He is being sued in both his individual and official capacities.

16.  At all times relevant hereto and in all their actions described herein, defendants DAVID BAILY, JOHN MCCLURE AND EDWIN FELICIANO were acting under color of the statutes, ordinances, regulations, policies, customs and usages of the New York City Police Department and New York City, pursuant to their authority as employees, servants and agents of the New York City Police Department, within the scope of employment and incidental to their otherwise lawful duties and functions as employees, servants, agents and police officers.

17.  The conduct and injuries complained of herein ensued without any negligent or culpable conduct on the part of plaintiffs.

**NOTICE OF CLAIM**

18.  On September 14, 2011, plaintiffs' Notices of Claim were filed with the Comptroller's Office of the City of New York.  More than thirty days have elapsed since the filing of the Notices of Claim and this matter has not been settled or otherwise disposed of.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

3

19.  On October 26, 2011, a hearing pursuant to New York State General Municipal Law section 50-h was held, at which time plaintiff RAYMOND RIVERA was questioned by a representative of defendant NEW YORK CITY.

20.  On October 26, 2011, a hearing pursuant to New York State General Municipal Law section 50-h was held, at which time plaintiff MINERVA VENTURA was questioned by a representative of defendant NEW YORK CITY.

21.  The transcripts of these two hearings are attached herewith as exhibits A (RAYMOND RIVERA) and B (MINERVA VENTURA) and as factual support for the causes of action alleged herein and are made part of this Complaint.

## FACTUAL BACKGROUND

22.  On or about June 24, 2011, at about 3:15 A.M., plaintiff RAYMOND RIVERA was in his home at 1191 Rev.  James Polite Avenue, Bronx, New York, and engaged in no criminal conduct, when, for no legal or other legitimate reason, and without showing a warrant, New York City Police Officers, including defendants DAVID BAILEY, JOHN MCCLURE and EDWIN FELICIANO, broke into this private house.

23.  Altogether there were approximately seven to ten police officers who entered the home, some of whom were in uniform and some in plainclothes.

24.  Plaintiffs RAYMOND RIVERA and MINERVA VENTURA were asleep in their bedroom upstairs at the time the police broke in.

25.  Hearing the noise and his dog barking, plaintiff Rivera went downstairs to see what was happening.

26.  As he stated at the 50-h hearing:

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

4

> I seen about seven or ten police around.
> Everything was, the whole furniture and
> everything. And then I said, what's going on,
> What happened and the guy hit me right
> there and I lost one tooth and I had
> surgery and everything. (P. 13, lines 11-16).

27. Plaintiff Rivera was hit at the top left-hand side of his lip.

28. Plaintiff Rivera was hit by the officer, believed to be defendant Det. John McClure, with a rifle with a flashlight attached to it.

29. The officer who assaulted Plaintiff Rivera was wearing a "SWAT" outfit with his face covered.

30. Plaintiff Rivera was thrown to the floor.

31. One of the detectives then threw Mr. Rivera into a chair.

32. When Mr. Rivera asked what the problem was, he was told to shut up.

33. He was then shown a photograph of a man whom he had been shown before by the police on a prior occasion.

34. He again said that he had never seen that person before.

35. Instead, having been naked, the police told him to put on some clothes and he ws arrested, although he had committed no crime.

36. When Mr. Rivera asked for medical treatment, the detectives told him that he would stay in jail longer so he received no medical treatment.

37. Earlier, after she heard a noise downstairs, Plaintiff Minerva Ventura saw her husband leave the bed and go downstairs.

38. She then started to come downstairs but went back to get her hearing aid when the police

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

5

came in and ordered her to sit down.

39. When Plaintiff Ventura went into the living room, she saw her husband bleeding.

40. She was also shown the photograph and, as she had told them before, said she had never seen the man.

41. Despite having committed no crime, the police arrested Ms. Ventura as well.

42. Both plaintiffs were` taken to a police precinct and locked up in cells.

43. Both remained there until about 1:00 PM.

44. Both were then transported to court (Central Booking).

45. Both remained in cells until about 6:30 PM.

46. Both were then released without seeing a judge because the District Attorney's office did not file any criminal charges against either Mr. Rivera nor Ms. Ventura.

47. As soon as he was released, Mr. Rivera went to the emergency room because the pain was unbearable.

48. He continued his medical treatment thereafter, which included stitches, bonding, bone graft, implant, etc.

49. Although depressed and told to seek mental health therapy by one of his doctors, Mr. Rivera could not do so because the medication he would take would prevent him from working on his job as a school bus driver.

50. Instead, he sought comfort from his priest and in prayer at his church.

51. This included dealing with recurring nightmares.

52. Both Plaintiffs missed time from work as a result of the incident with the police.

53. The police caused physical damage to property in the Plaintiff's residence, some of

which is missing.

54. The assault, arrest, charge and imprisonment of plaintiffs and all the damage to their property, were the direct result misconduct by all defendants.

55. At no time did Plaintiffs commit any acts, or engage in conduct, which in any way justified the actions of the defendants.

56. As a direct and proximate result of the defendants' actions, plaintiffs were falsely and illegally imprisoned for approximately 15 hours.

57. As a direct and proximate result of the defendants' actions, plaintiff Rivera suffered physical injury during the course of these unlawful actions.

58. As a direct and proximate result of the defendants' actions, both plaintiffs sustained emotional distress, suffering, and damage to their reputations.

59. As a direct and proximate result of the defendants' actions, plaintiffs were maliciously prosecuted.

60. As a direct and proximate result of the defendants' action, plaintiffs sustained damage to and loss of their property.

61. As a direct and proximate result of the defendants' actions, plaintiffs were deprived of rights, privileges and immunities under the Fourth and Fourteenth Amendments to the United States Constitution and the laws of the State of New York.

62. Defendant New York City, as a matter of policy and practice, has with deliberate indifference failed to adequately discipline, train or otherwise direct police officers, including the defendant police officers, with regard to the rights of individuals, thereby causing the defendant officers in this case to engage in the unlawful conduct described above.

63. Defendant New York City, as a matter of policy and practice, has with deliberate

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

indifference failed to properly sanction or discipline police officers, including the police officer defendants in this case, for violation of the constitutional rights of individuals, thereby causing police, including the defendants in this case, to engage in t he unlawful conduct described above.

64. Defendant New York City, as a matter of policy and practice, has with deliberate indifference failed to properly investigate the background, beliefs and attitudes of prospective police officers in order to ensure it hires only police officers that respect and honor the constitutional rights of individuals, thereby causing police, including the defendant police officers in this case, to engage in the unlawful conduct described above.

## COUNT ONE: VIOLATION OF CONSTITUTIONAL RIGHTS
### (Defendants Bailey, McClure and Feliciano)

65. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-64 of this complaint, as though fully set forth herein.

66. The acts, omissions and conduct of the defendants Bailey, McClure and Feliciano, all members of the New York City Police Department, and all acting under color of state law, deprived plaintiffs of their rights, privileges and immunities under the laws and Constitution of the United State; in particular the rights to be secure in their person and property, to be free from false arrest, false imprisonment, malicious prosecution, excessive force and cruel and unusual punishment and to due process.

67. By these acts, omissions and conduct, these individual defendants have deprived plaintiffs of rights secured by the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. Section 1983, for which the defendants are individually liable.

## COUNT TWO: VIOLATION OF CONSTITUTIONAL RIGHTS
### (Defendant New York City)

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

68.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-67 of this complaint, as though fully set forth herein.

69.   The acts, omissions and conduct of defendant New York City, as set forth above, deprived plaintiffs of their rights, privileges and immunities under the laws and Constitution of the United States; in particular the rights; to be secure in their person and property; to be free from unlawful seizure, false imprisonment, malicious prosecution; excessive force and cruel and unusual punishment and to due process.

70.   By these acts, omissions and conduct, defendant New York City has deprived plaintiffs of rights secured by the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. Section 1983.

### COUNT THREE: CONSPIRACY TO VIOLATE CIVIL RIGHTS
### (Defendants Baily, McClure and Feliciano)

71.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-70 of this complaint as though fully set forth herein.

72.   The defendants Bailey, McClure and Feliciano conspired to violate plaintiffs' civil rights by agreeing between themselves to falsely charge them with crimes as described above, in violation of 42 U.S.C. 1983, for which defendants are individually liable.

### COUNT FOUR: FALSE ARREST
### (Defendants Bailey, McClure and Feliciano)

73.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-72 of this complaint, as though fully set forth herein.

74.   The acts, omissions and conduct of defendants Bailey, McClure and Feliciano as alleged above, constitute false arrest under the laws of the State of New York.  This Court has pendant

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

jurisdiction to hear and adjudicate such claims.

## COUNT FIVE: FALSE IMPRISONMENT
### (Defendants Bailey, McClure and Feliciano)

75. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-74 of this complaint, as though fully set forth herein.

76. The acts, omissions and conduct of defendants Bailey, McClure, and Feliciano, as

alleged above, constitute false imprisonment under the laws of the State of New York. This Court has pendant jurisdiction to hear and adjudicate such claims.

## COUNT SIX: ASSAULT

77. Plaintiffs repeat and re-allege the allegations in paragraphs 1-76 of this complaint, as though fully set forth herein.

78. The acts and conduct of defendants Bailey, McClure and Feliciano, as alleged above, constitute assault under the laws of the State of New York. This Court has pendant jurisdiction to hear and adjudicate such claims.

## COUNT SEVEN: MALICIOUS PROSECUTION
### (Defendants Bailey, McClure and Feliciano)

79. Plaintiffs repeat and re-allege the allegations contained in paragraph 1-78 of this complaint, as though fully set forth herein.

80. the acts, omissions and conduct of defendants Bailey, McClure, and Feliciano, as alleged above, constitute malicious prosecution under the laws of the State of New York. This Court has pendant jurisdiction to hear and adjudicate such claims.

## COUNT NINE: RESPONDEAT SUPERIOR LIABILITY
### (Defendant New York City)

81. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-80 of this complaint, as though fully set forth herein.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

10

82.   At all times pertinent hereto, defendants Bailey, McClure and Feliciano, were acting within the scope of their employment as officers of the New York City Police Department.

83.   Defendant New York City is thus liable under the doctrine of respondeat superior, for the intentional torts of defendants Bailey, McClure and Feliciano, committed within the scope of their employment.

**COUNT TEN: NEGLIGENCE**
**(Defendants Bailey, McClure, and Feliciano)**

84.   Plaintiffs repeat and re-allege the allegations contained in paragraph 1-83 of this complaint, as though fully set forth herein.

85.   The defendants Bailey, McClure and Felicia no, while acting as agents and employees for New York City, owed a duty to plaintiffs to perform their duties without violating plaintiffs' constitutional rights.  Defendants' conduct constitutes negligence for which these defendants are individually liable.

**COUNT ELEVEN: NEGLIGENCE**
**(Defendant New York City)**

86.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-85 of this complaint, as though fully set forth herein.

87.   Defendant New York City owed a duty to plaintiffs to adequately screen prospective police officers, and to train, supervise and otherwise control its police officers in the use of their powers incidental to their employment.  Defendant New York City failed to provide adequate screening, training, supervision, and control of the individual defendants, which failure constitutes negligence.

WHEREFORE, Each plaintiff demands the following relief;

a.   Compensatory damages in the amount of two million ($2,000,000 dollars).

b.   Punitive damages in the amount of two million ($2,000,000 dollars).

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

11

    c. Reasonable attorneys fees and costs; and

    d. Such other and further relief as appears reasonable and just.

Dated: New York, New York
       June 12, 2012

                                   IRVING COHEN
                                   Attorney for Plaintiffs
                                   233 Broadway, Suite 2701
                                   New York, New York 10279
                                   (212) 964-2544

50-H HEARING                          015220

- - - - - - - - - x BLA: 2011PI031890

In the Matter of the Claim of

RAYMOND A. RIVERA,

       Claimant,

    -against-

THE CITY OF NEW YORK and THE NEW YORK CITY

POLICE DEPARTMENT,

       Respondents.

- - - - - - - - - - - - - - x


      EXAMINATION of RAYMOND RIVERA, the

Claimant, pursuant to Notice, held at the

offices of Shapiro, Beilly & Aronowitz, 225

Broadway, New York, New York, on October 26,

2011 at 2:11 p.m. before Karla Vallaro, a

Notary Public of the State of New York.


   **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

REPORTER'S INK, CORP.

90 John Street, Suite 411

New York, New York  10038

(646) 395-2522

2

```
 1
 2                  A p p e a r a n c e s:
 3    IRVING COHEN, ESQ.
              Attorneys for Claimant
 4            233 Broadway, Suite 2701
              New York, NY 10279
 5    BY:  IRVING COHEN, ESQ.
 6
 7

      SHAPIRO, BEILLY & ARONOWITZ, LLP
 8            Attorneys for Respondents
              225 Broadway, 13th Floor
 9            New York, NY 10007
      BY:  DAVID MELTZER, ESQ.
10            FILE #: NYC-2349
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                        R. RIVERA
 2    RAYMOND RIVERA, the witness herein, having
 3    been first duly sworn by a Notary Public of
 4    the State of New York, was examined and
 5    testified as follows:
 6    EXAMINATION BY
 7    MR. MELTZER:
 8    Q      Please state your name for the record.
 9    A      Raymond Rivera.
10    Q      Where do you reside?
11    A      1191 Reverend James Polite Avenue,
12    Bronx, New York 10459.
13    Q      Good afternoon Mr. Rivera.  My name is
14    David Meltzer, I represent the City of New
15    York for the purposes of this claim.  I'll be
16    asking you some questions about an incident
17    that occurred on June 24, 2011 and about the
18    time subsequent to that where you were in
19    police custody.  I'll also be asking you
20    question about any physical or mental injuries
21    you sustained as a result of you being in
22    police custody.
23          If you don't understand my question,
24    please let me know and I'll reword the
25    question for you.  If you'd like one of the
```

4

1                    R. RIVERA

2      questions repeated, the reporter is taking

3      down everything that I say and she can read

4      the question back to you from the record.

5      She's also taking down what you say, but she

6      can only take down what you say out loud.  If

7      you nod or shake your head, make a motion with

8      your hands or point to something, that can't

9      get reflected in the record.  Your answers

10     have to be spoken.

11           Finally, even if you where my question

12     is going, please wait until I finish asking it

13     before you begin your answer.  If we're both

14     talking at the same time, it's very difficult

15     for the reporter to take down what we're both

16     saying.  Do you understand those instructions?

17     A      **Yes.**

18     Q      What's your date of birth?

19     A      **March 1,1951.**

20           MR. MELTZER:  In an off the record

21           stipulation by and between counsel, it

22           has been agreed that the claimant will

23           be providing me with his entire social

24           security number.  However, in the

25           interest of privacy only the last four

5

1                        R. RIVERA

2          digits of the social security number

3          will be on the official recorded

4          transcript of this hearing.

5     Q    What is your complete social security

6     number?

7     A    **XXX-XX-4554.**

8     Q    Have you ever sued the City or State of

9     New York before?

10    A    **No.**

11    Q    Are you currently receiving Medicare or

12    Medicaid benefits?

13    A    **No.**

14    Q    Before the incident of June 24th, had

15    you ever been arrested within the City of New

16    York?

17    A    **Never.**

18    Q    At the current time are you employed?

19    A    **Yes.**

20    Q    Do you work for yourself or for someone

21    else?

22    A    **Someone else.**

23    Q    Who do you work for?

24    A    **The name of the company is Amboy.**

25    Q    What do you do for Amboy?

1                          R. RIVERA

2    A       A school bus transportation.  A school

3    bus driver.

4    Q       How long have you been driving kids to

5    school?

6    A       Twenty, but I got eleven in this

7    company.

8    Q       Eleven years with Amboy?

9    A       Yes.

10   Q       Who do you live with at 1191 Reverend

11   James Polite Avenue?

12   A       I live with my wife.

13   Q       What is her name?

14   A       Minerva Ventura.

15   Q       Other then you and Minerva, does anyone

16   else live there?

17   A       Andre Dark.

18   Q       D-A-R-K?

19   A       Yes.

20   Q       Anyone else?

21   A       Nobody else.

22   Q       What is the relation of Andre Dark to

23   either you or Minerva?

24   A       He's a -- Minerva my wife.

25   Q       Who is Andre Dark?

R. RIVERA

2   **A      Andre Dark is my stepson.**

3   Q      How old is Andre?

4   **A      He's going to be thirty years now.**

5   Q      On June 24th, was there anyone in the

6   apartment besides you, your wife and Andre

7   Dark?

8   **A      Nobody else.**

9   Q      Before June 24, 2011, had there been any

10   prior incidents where the police came to your

11   door?

12   **A      Yes.  They came two times to my door.**

13   **One time two detectives came looking for**

14   **somebody personally.**

15   Q      When was that first time?

16   **A      The first time it was like April 23rd.**

17   **Something like that or 25th.  One morning it**

18   **happened before the incident.**

19   Q      First April 23rd and 25th?

20   **A      Yes.  Somewhere.**

21   Q      What time in the morning or in the

22   afternoon?

23   **A      No, it was in the afternoon.  About**

24   **6:00-5:30.  Something like that.**

25   Q      What happened on April 23rd or 25th when

1                    R. RIVERA

2    the police came to your door?

3    A    Well, they told me they are looking for

4    somebody and they would like to see the second

5    floor, which is a tenant there.  Marcelo

6    Torribio (sic).

7    Q    Then what did they do?

8    A    And I take them by myself.  I explained

9    to the detective, I'm the owner of the

10   property and go all the way.  I take to them

11   to the second floor, to show where they are

12   looking for.  We went inside the tenant's and

13   he saw the apartment and everything and he saw

14   a young guy.  It was the tenant there, which

15   was one of the sons of Marcelo Torribio.  And

16   he showed the face, the picture of the guy.

17   We spent seven to ten minutes, something like

18   that.

19   Q    Was there ever an arrest of Mr. Torribio

20   or his son after that?

21   A    No, no.

22   Q    When was the second time the police came

23   to your door?

24   A    About two weeks after, before the

25   incident of June 24th.  They came one more

9

R. RIVERA

2    time with the same picture and they showed

3    Andrea.

4    Q    Andrea, who is Andrea?

5    A    Andrea, she's the girlfriend.  The

6    girlfriend of Andre.  So Andrea told me,

7    because I wasn't there.  I'm working and she

8    told me the police were there and they showed

9    the same picture and everything.  And I said,

10   describe the picture who it was, it was the

11   same person.  She said a young guy with the --

12   how do you say it, curly --

13   Q    An Afro?

14   A    No, curly.  Like curly hair.

15   Q    Curly hair?

16   A    Yeah, curly or something like that.  I

17   told her well, don't worry, because they went

18   before and I tell them any time they want to

19   come and show them the property I have nothing

20   to hide.

21   Q    The police came twice to show you a

22   picture of someone to ask if you knew him or

23   if he lived there?

24   A    Right.

25   Q    The first time you showed them the

```
 1                          R. RIVERA

 2     second floor and they saw that no one matched

 3     that description and then they showed the same

 4     picture to Andre's girlfriend?

 5               MR. COHEN:  Andrea, that's who

 6          they showed the picture to.

 7               MR. MELTZER:  The second time,

 8          yes.

 9               MR. COHEN:  That's not Andre's

10          girlfriend.

11     A     No, no, Randy.  Randy's girlfriend.  I'm

12     sorry.

13     Q     Who is Randy?

14     A     Randy is my son.  I'm sorry.

15     Q     Does Randy live with you also?

16     A     Yes.  He lives on the third floor.

17               MR. COHEN:  Off the record.

18               (Whereupon, a discussion was held

19          off the record.)

20               MR. MELTZER:  Back on the record.

21     Q     The first floor is Mr. Rivera and his

22     wife.

23     A     Yes.  And Andre.

24     Q     And Andre.  The second floor is

25     Torribio.
```

1                              R. RIVERA

2    A        Torribio, yes.

3    Q        He's your tenant.

4    A        Yes.

5    Q        The third floor is your son Randy and

6    Andrea.

7    A        Yes.

8    Q        Did you next have contact with the

9    police on June 24, 2011?

10   A        Can you repeat it?  Sorry.

11   Q        Did the police then come to you next on

12   June 24, 2011?

13   A        Yes.  They come to me.  They never talk

14   to me, but they come in my house.  I never

15   made contact.

16   Q        On June 24, 2011, what time of the day

17   did the police come to your house?

18   A        About 3:00 in the morning.

19   Q        Did they have a warrant?

20   A        No, they don't show me a warrant.

21   Q        Do you know if they had a warrant for

22   the other times that they came to show you the

23   picture?

24   A        No.

25   Q        Did they ever tell you that they had a

12

1                              R. RIVERA

2    warrant?

3    A       No, no.

4    Q       On June 24, 2011 at 3:00 a.m., did the

5    police knock on the door or did they break it

6    in or something else?

7    A       They broke it in, yes.

8    Q       Approximately, how many police officers

9    entered your apartment that morning?

10   A       It was a swat.  About seven or ten

11   police.  Something like that.

12   Q       Were they wearing uniforms?

13   A       Yes.  Some were in uniform and the other

14   ones were plainclothes.  Like a detective.

15   Q       Do you know what precinct they were

16   from?

17   A       No.

18   Q       Were you asleep at the time?

19   A       Yes.

20   Q       Was that in the bedroom?

21   A       Yes, in my bedroom.

22   Q       Was Minerva also asleep in the bedroom?

23   A       Yes.

24   Q       What was the first notice or knowledge

25   that you had of the police coming into your

1                         R. RIVERA

2     apartment.  What did you see, what did you

3     hear?

4     A      What I heard, a lot of noise and my dog

5     went crazy.  My little dog went crazy.  They

6     were making a lot of noises.  So I was so

7     nervous, so I went down to check out what was

8     happening.

9     Q      When you went to check it out, what

10    happened?

11    A      I seen about seven or ten police around.

12    Everything was, the whole furniture and

13    everything.  And then I said, what's going on.

14    What happened and the guy hit me right there

15    and I lost one tooth and I had surgery and

16    everything.

17                  MR. MELTZER:  When he said, he hit

18              me there, he's indicating me to the top

19              left-hand side of his lip and indicating

20              that he lost a tooth.  And there is a

21              front left tooth that does appear to be

22              missing in his mouth.  His front top

23              left tooth.

24    Q      Did the officer strike you with his hand

25    or with something in his hand?

14

1                                R. RIVERA

2    **A      Yes, it was something.  He got a rifle**

3    **and he had like a flashlight or something like**

4    **that.**

5    Q      A flashlight?

6    **A      Yes.  And they do it to me like this.**

7    Q      Indicating a pushing motion.  Was it the

8    flashlight or the rifle?

9    **A      The rifle with a flashlight.  When I**

10   **received the hit there I went like this and he**

11   **threw me to the floor.**

12   Q      Was the flashlight attached to the

13   rifle?

14   **A      Yes.**

15   Q      The claimant has indicated that the

16   flashlight was attached to the rifle and the

17   officer made a poking motion.  Pushing his

18   hands forward, holding the flashlight and

19   rifle and that the end of the rifle came in to

20   contact with his tooth.  Knocking the tooth

21   out.

22          Was that the back of the rifle or the

23   front of the rile?

24   **A      It was the front.  The front of the**

25   **rifle.**

1                      R. RIVERA

2    Q    Did that officer say anything to you

3    before poking you in the face?

4    A    No.

5    Q    Were you able to get the officer's name

6    or badge number, who hit you in the face?

7    A    No.  Because they were wearing a black

8    thing with a mask and everything.

9    Q    He was wearing a swat outfit?

10   A    Right.

11   Q    That was a full face cover?

12   A    Right.

13   Q    After you were hit by the rifle, then

14   went happened?

15   A    Then he threw me to the floor and I

16   started bleeding.

17            MR. COHEN:  Indicating from his

18        mouth.

19            MR. MELTZER:  Indicating bleeding

20        from his mouth.

21   A    Yes.  And one of the detectives, threw

22   me and carried me, so he can me put me in the

23   chair.  He threw me on the chair and I asked

24   one more time, what's going on.  Why are you

25   here, what's the problem.

R. RIVERA

2  Q      What did he say?

3  A      They said shut up.  I'll let you know

4  later.  Then he spent about three minutes and

5  he showed me the same picture he showed me

6  before, with the same guy.  And I told him,

7  you come in here twice and I told you the guy

8  doesn't live in here.

9  Q      Did you ever recognize the guy in the

10  photo?

11  A      No.  They show me before but he looked

12  like the same one that he showed me.

13  Q      You didn't know the person in the

14  photograph?

15  A      No.  I've never seen this person before.

16  Q      While this was going on to you, did you

17  see what was done with regard to your wife?

18  A      No. I don't know about that.

19  Q      While you were in the chair did they put

20  you in handcuffs?

21  A      No.  I was back in the chair and

22  bleeding and they said they were going to call

23  the ambulance, emergency and then they called

24  the ambulance, but they didn't do nothing to

25  me.  They threw me a pillow from the top to

17

### R. RIVERA

2   cover myself.  They threw it to me like this,

3   and I covered myself.  I was naked.

4   Q     When you got out of bed, were you

5   wearing any clothing.  Pajamas, underwear,

6   anything?

7   A     No, nothing.

8   Q     They threw you a pillow while you were

9   on the chair?

10  A     Yes.

11  Q     Did they allow you to get dressed?

12  A     No.  Not for the moment.  They waited

13  for -- when they told me your going to be

14  arrested, they said you have to put something

15  on.  We're going to take you to the precinct.

16  My wife and me.

17  Q     How long were you naked for before they

18  allowed you to get dressed?

19  A     About twenty-eight minutes.  Something

20  like that.

21  Q     Did the ambulance come to your house?

22  A     Yes.

23  Q     Did they give you any treatment for your

24  facial injury?

25  A     No.

18

1                          **R. RIVERA**

2    Q      Did they take you to any hospital,

3    emergency room or dental clinic?

4    **A      No. No.**

5    Q      How long were the police inside your

6    apartment for?

7    **A      Well, my wife and me, they take us to**

8    **the precinct.  But they spent, this time about**

9    **thirty-five minutes.  Something like that,**

10   **probably.**

11   Q      What precinct were you taken to?

12   **A      I think it was 180th.  It was Tremont**

13   **Avenue.  180th Street.  I think 180th Street.**

14   Q      That's 180th Street and Tremont?

15   **A      Yes.  It's right on the corner of**

16   **something there.**

17   Q      How long did you stay at the precinct

18   for?

19   **A      For about four hours in this precinct,**

20   **but they take me to the court.**

21   Q      Did you say a full hour or four hours?

22   **A      The first time about, in this precinct,**

23   **about four or five hours.  Something like**

24   **that.  I don't remember clearly.**

25   Q      In the four to five hours, did anyone

1                          R. RIVERA

2     read you your rights?

3     A      No.

4     Q      Were you fingerprinted?

5     A      Yes.

6     Q      Were you photographed?

7     A      Yes.

8     Q      Were you placed in a holding cell?

9     A      Yes.

10    Q      When you were in the holding cell were

11    you the only one there or were there other

12    people in the cell?

13    A      No.   My wife and me only.

14    Q      Did you receive any medical treatment

15    while you were at the precinct?

16    A      No.   No.

17    Q      Did you speak to any of the officers

18    while you were in the precinct?

19    A      Yes.

20    Q      Who did you speak with?

21    A      What is the name -- not Detective

22    Bailey, it was another one.  They said, you

23    have to talk to Detective Bailey.  They told

24    me, the Hispanic guy there and I said let me

25    call a lawyer or my job and they said no, you

1                           R. RIVERA

2    have to speak to Detective Bailey.

3    Q     Did you speak to Detective Bailey?

4    A     No, he crossed two times and I knocked

5    and he ignored me, all the time.  Then he

6    called the phone and said he said the key for

7    my safe and I said, okay, it's my pleasure,

8    just go.  I explain to him where he would find

9    it.  He find it, my whole document and

10   everything and they went to the basement and

11   everything.

12   Q     Indicating the basement of your house?

13   A     Yes.  In my house they tried to find the

14   key for the safe.

15   Q     Did they take you from the precinct to

16   the court, to Central Booking?

17   A     Yes.

18   Q     When they took you to Central Booking,

19   were you put in another cell?

20   A     Yes.

21   Q     How long did you remain at Central

22   Booking for?

23   A     Oh, my god -- about ten hours.  Probably

24   more.  For me it felt like four years.

25   Q     In that ten hours or so, did anyone read

R. RIVERA

2   you your rights then?

3   **A    No.  No.**

4   Q    Were you fingerprinted again?

5   **A    Yes.**

6   Q    Were you photographed again?

7   **A    Yes.  Yes.**

8   Q    Did anyone give you any food or drink?

9   **A    No.  No.**

10  Q    Did you receive any medical treatment?

11  **A    No.**

12  Q    Either at the precinct or at Central

13  Booking, did request medical treatment?

14  **A    Yes, two times.**

15  Q    What did they say?

16  **A    One of the detectives said, if you go to**

17  **the hospital, you're going to wait more**

18  **longer.  You're going to stay in the jail more**

19  **time.  So I keep my mouth shut up because I**

20  **want to get out of there as soon as possible.**

21  Q    Did there come a time at Central Booking

22  where they took you out of the cell?

23  **A    No, they put me with a lot of inmates.**

24  Q    Did you then go before the court and see

25  a judge?

1                      R. RIVERA

2    **A       No.**

3    Q     How did you get released from Central

4    Booking.  What did they say to you?

5    **A       Detective Bailey, he come to my jail and**

6    **he said you free, come on, come on outside.**

7    **He told me walk with me and he said your wife**

8    **is waiting for you outside and I'm really**

9    **sorry what happened to you.**

10           **That's all that he told me, Detective**

11   **Bailey.  And my mouth was like this, because**

12   **it got a lot of infection.  It was very, and**

13   **My wife was crying outside when I went there.**

14   Q     Detective Bailey, do you know his or her

15   first name?

16   **A       No, last time.**

17   Q     What's Detective Bailey's first name?

18   **A       Steve or something like that.**

19   Q     Steve?

20   **A       Steve Bailey.  Something like that.**

21              MR. COHEN:  I have it here, David.

22   **A       Oh, David.**

23              MR. MELTZER:  B-A-I-L-Y.

24              MR. COHEN:  B-A-I-L-E-Y?

25              MR. MELTZER:  What precinct do you

1                          R. RIVERA

2          have for him?

3                  MR. COHEN:  Let me look, he's with

4          NBMS.  But I can't tell you where their

5          offices are.

6                  MR. MELTZER:  NMBS?

7                  MR. COHEN:  It looks like North

8          Bronx MS something squad.

9                  MR. MELTZER:  Off the record.

10                 (Whereupon, a discussion was held

11         off the record.)

12                 MR. MELTZER:  Back on the record.

13    Q     When for the first time did you seek

14    medical treatment for the injury to your

15    mouth?

16    A     **As soon as they released me from the**

17    **jail I went straight to the emergency room,**

18    **because the pain was unbelievable.  It felt so**

19    **bad.**

20    Q     What emergency room did you go to?

21    A     **I went to Lebanon Hospital I think it**

22    **was.**

23    Q     Bronx Lebanon?

24    A     **Yes.**

25    Q     What treatment did they give you the day

24

1                              R. RIVERA

2    you went to Bronx Lebanon?

3    A       **They checked me, they give me tetanus.**

4    Q       A tetanus shot?

5    A       **Yes, for the pain and they give me**

6    **Tylenol.  The guy said I have to see the**

7    **dentist right a way, because I had an**

8    **infection there.  They gave me antibiotics and**

9    **then the next day I went to the dentist.**

10   Q       The dentist you went to the next day,

11   was that also at Bronx Lebanon?

12   A       **No.  It was a private doctor on Fordham**

13   **Road.**

14   Q       What was the name of the doctor on

15   Fordham Road?

16   A       **Dr. Liu.  I think it is.**

17   Q       L-I-U?

18   A       **It's a Chinese doctor.  I don't know the**

19   **doctor.**

20                      MR. MELTZER:  By counsel, you went

21               to City Dental Center Fordham Plaza

22               Dental Associates.

23   Q       How many times did you go to see Dr. Liu

24   or any other doctor at Fordham Road?

25   A       **About let me see, seven times now.**

1                          R. RIVERA

2    Q      What dental treatment was given to you

3    on the times that you went?

4    A      Well, first they put a needle there and

5    they said they are going to put a bond,

6    because the bond was a little cracked.   They

7    are going to put a new bond there and they

8    said they are going to put an implant.   So

9    they sewed this part here and put stitches

10   there.

11   Q      Indicating stitches on the gum line.

12   A      Right.   And they said I have to take

13   antibiotics for one week.

14   Q      Are they still working on your tooth to

15   do the implant?

16   A      Yes, they said they are going to spend

17   about the most, seven months.   They said I

18   have to wait for it to heal.   When it heals

19   for bone graft.

20   Q      In order to do the implant, in addition

21   to stitching your mouth, did they also have to

22   do any other preparation work?

23   A      Yes.   They had to, this part right now.

24   Q      Indicating the gum.

25   A      Yes.   They said to see the gum, they

1                              R. RIVERA

2      **have check to see to do another job.**

3      Q      Did you have a bone implant?

4      **A      Yes.**

5      Q      Was that also done at this dental

6      center?

7      **A      They are going to say that.  But they**

8      **don't have it yet.  They said they are going**

9      **to do that.  What they do now is stitches and**

10     **separate this part with other one.**

11     Q      What they have done, is they cleaned up

12     your mouth.  They gave you antibiotics and

13     they sewed it up and waited for it to heal.

14     **A      Right.**

15     Q      After it heals, what they are going to

16     do in the future, is give you a bone graft.

17     **A      Right.**

18     Q      And on to the graft they will then place

19     the implant.

20     **A      That's right.**

21     Q      That procedure will take about seven

22     months from the healing until it is fixed.

23     Right?

24     **A      Yes, that's exactly right.**

25     Q      I see bills that you got.  One is for

1                         R. RIVERA

2       $300 and one is for $1,900.  Is this covering

3       the whole cost of the treatment or are there

4       going to be more bills to pay in the future?

5       A       Well, she told me probably she's going

6       to take another photo outside, around there.

7       So probably I'll have to spend more now.  She

8       didn't tell me when she's going to do that.

9       Q       Has any of this treatment been covered

10      by any form of healthcare or dental insurance?

11      A       The photo -- $1,181, the company I was

12      working, they covered but the implant is

13      coming out of my pocket.  The $1,900 and the

14      other one I have pay by myself.

15      Q       They covered the x-rays --

16      A       Right.

17      Q       All the treatment is out of your pocket?

18      A       Yes.

19      Q       Other then the treatment that you

20      received at Bronx Lebanon on the day of your

21      release and the seven sessions that you went

22      to the Dental Center on Fordham Plaza, have

23      you seen other any other medical health care

24      providers or dental health care providers?

25      A       Well, the doctor from the Lebanon told

1                          R. RIVERA

2    me I have to go for psychological, because I

3    was so depressed that day.  And I went to the

4    company and the company told me I can't use it

5    because I have to take a pill and I can't -- I

6    won't be able to drive the kids for the

7    school.  So I stopped that and I go usually

8    with my prayer and talk to the father in the

9    church.  This is the way I live right now.

10   Q     Other then the father in your church,

11   have you seen any other psychiatrist or

12   psychologist?

13   A     No.

14   Q     In addition to your dental injuries, did

15   you sustain any other physically injuries?

16   A     Yes, my eyes.  This part right here.

17   Q     Indicating the lower orbit of this left

18   eye.

19   A     Yes.

20   Q     What happened to the lower orbit of your

21   left eye?

22   A     When I received the hit, I got about two

23   days I couldn't see clearly.  It was very

24   close to my eye, because the hit was so hard.

25   Q     Did anyone take any of pictures of you

29

1                              R. RIVERA

2    immediately after the incident other then the

3    police.  Your wife, your son?

4    A      Yes.  My son took pictures.

5                   MR. COHEN:  I'll get them for you.

6                   MR. MELTZER:  By counsel, I have

7              now been provided with a copy of two

8              xeroxed photographs depicting the

9              claimant's face following this incident.

10   A      I forgot to tell you, I have a lot of

11   nightmares now.

12   Q      We'll get to it.

13                  MR. MELTZER:  Counselor, has

14             provided me with two photographs.  We

15             have now marked them collectively as

16             Exhibit A.

17                  (Whereupon, photographs were

18             marked as Respondent's Exhibit A, for

19             identification, as of this date.)

20                  MR. MELTZER:  Back on the record.

21   Q      Who took these photographs?

22   A      My son.

23   Q      For the photograph, I'll number them.

24   I'll number them one and two.  When was

25   photograph one taken?

R.  RIVERA

1

2  **A       It was taken as soon as they released**

3  **me.  The same day.**

4  Q       When was photograph two taken?

5  **A       June 25th.  The next day.  June 25th.**

6  Q       Did you ever receive any documentation

7  from the City of New York Police Department

8  with regard to the arrest?

9  **A       No.**

10  Q       Did you ever receive any Certificate of

11  Dismissal or Certificate of Decline to

12  Prosecute from the City of New York as a

13  result the of this incident?

14  **A       No.  The only thing I went to Court to**

15  **look for the deposition.  I got the deposition**

16  **there.  I don't receive nothing there.**

17  Q       Would that be the deposition of Officer

18  Bailey?

19  **A       Yes.**

20  Q       Did you get a copy of the deposition of

21  --

22  **A       Yes, sir.**

23               MR. MELTZER:  Counselor, do you

24          have the deposition of Officer Bailey or

25          Detective Bailey.

1                        R. RIVERA

2              MR. COHEN:  Deposition?

3              MR. MELTZER:  That's what they

4        call the statement to get the warrant or

5        the statement he gave.

6              MR. COHEN:  You mean the affidavit

7        in support of the warrant.

8              MR. MELTZER:  Yes.

9              MR. COHEN:  That has not been

10       provided.

11             MR. MELTZER:  By counsel, I have

12       now received and have now marked as

13       Defendant Exhibit B for today's date a

14       document indicating that no charges were

15       filed against this individual.  The

16       document is on stationary from the

17       Supreme Court of the State of New York.

18       Criminal Division Bronx New York.

19             (Whereupon, a document was marked

20       as Respondent's Exhibit B, for

21       identification, as of this date.)

22             MR. MELTZER:  Back on the record.

23   Q    Did you have any medical treatment for

24   your eye either at a hospital or from anywhere

25   else?

1                          R. RIVERA

2    **A**      **No.**

3    Q      Did anyone take any X-rays of your eye

4    or of your face other then the dentist?

5    **A**      **No.  What I do, how do you call.  A**

6    **natural thing.  A remedy, natural.  Like my**

7    **mother gave me a lot of things to take.  A lot**

8    **of antibiotics they told me to take.**

9    Q      As a result of this incident, did you

10   miss any time from work?

11   **A**      **Yes.**

12   Q      How much time did you miss?

13   **A**      **Two days almost.**

14   Q      Were you covered by sick days or

15   vacation days?

16   **A**      **No.**

17   Q      Obviously, I don't want to know what you

18   talk to your priest about, because that's

19   confidential.  But what mental problems do you

20   have following this incident?

21   **A**      **First of all, I can't sleep no more.  I**

22   **got a lot of nightmares.  Another thing is,**

23   **any noise the dog hears, he's going crazy and**

24   **no body is sleeping there now and I can't take**

25   **a pill, because I have to my driving and it's**

1                            **R. RIVERA**

2     **very hard for me now.   I try to deal with**

3     **situation the most I can.**

4                    MR. MELTZER:  By counsel, I have

5              also been provided with a variety of

6              other documents which go towards the

7              damages sustained by the claimant in

8              this case.  The first document we have

9              marked as Exhibit C is a copy of various

10             bills and receipts from City Dental

11             Center.  Totaling the first bill of

12             $1,900 and the second of $300.

13                    The second document is from Bronx

14             Lebanon Hospital.  It is a two-page

15             document addressed to patient, Raymond

16             Rivera with attending caregiver, Craig

17             Mochson M-O-C-H-S-O-N entitled "open

18             wound/lip" and instructions that goes

19             with the dental care.  We've marked that

20             as Exhibit C.

21                    Exhibit D, are various treatment

22             plans which are treatment that was

23             provided by City Dental Center.  These

24             are various dates and it is a four-page

25             document and that is marked as Exhibit

1                      R.  RIVERA

2          E.

3                  Finally Exhibit F, the claimant is

4          claiming that he lost two days of work.

5          Exhibit F, is a document from Atlantic

6          Express Amboy Bus demonstrating the pay

7          that he got, although it does not

8          demonstrate or document the two days

9          that he missed from work.

10                 (Whereupon, receipts, a lip wound

11         document, an treatment plan and a work

12         document were marked as Respondent's

13         Exhibit C through F, for identification,

14         as of this date.)

15                 MR. MELTZER:  At this time I'm

16         going to call for authorizations to

17         obtain the medical records of City

18         Dental, of Bronx Lebanon, of Atlantic

19         Express and also any District Attorney

20         or arrest records as the same may be

21         applicable.

22                 MR. COHEN:  We object to that at

23         this time.

24                 MR. MELTZER:  That concludes

25         today's 50H Hearing.  Thank you.

```
 1                    R. RIVERA

 2            MR. COHEN:   Thank you.

 3            (Time noted 3:01 p.m.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         R. RIVERA

2              A C K N O W L E D G E M E N T

3              STATE OF NEW YORK)

4

5    I, Raymond Rivera, hereby certify that I have

6    read the transcript of my testimony taken

7    under oath in my 50-H Hearing of October 26,

8    2011, that the transcript is a true, complete

9    and correct record of what was asked, answered

10   and said during this 50-H Hearing, and that

11   the answers on the record as given by me are

12   true and correct.

13

14

15   _____

16

17

18              Signed and subscribed to

19              Before me, this _____ day

20              Of _____, _____

21              _____

22              Notary Public

23

24

25

1                         R. RIVERA

2                     I N D E X

3

    WITNESS            EXAMINATION BY            PAGE

4

    R. RIVERA          MR. MELTZER               3

5

6                      EXHIBITS

7   RESPONDENT'S       DESCRIPTION               PAGE

8   A                  PHOTOGRAPHS               29

    B                  DOCUMENT                  31

9   C                  RECEIPTS                  34

    D                  LIP WOUND CARE DOCUMENT   34

10  E                  TREATMENT PLAN            34

    F                  WORK DOCUMENT             34

11

12              REQUESTS FOR PRODUCTION

13  DESCRIPTION                                  PAGE

14  MEDICAL AUTHORIZATIONS                       34

15  CRIMINAL & D.A. AUTHORIZATIONS               34

16

17

18

19

20

21

22

23

24

25

```
 1                         R. RIVERA

 2                    C E R T I F I C A T E

 3       I KARLA VALLARO, hereby certify that the

 4   50-H Hearing of RAYMOND RIVERA was held before

 5   me on the 26th day of October, 2011; that said

 6   witness was duly sworn before the commencement

 7   of the testimony; that the testimony was taken

 8   stenographically by myself and then

 9   transcribed by myself; that the party was

10   represented by counsel as appears herein;

11       That the within transcript is a true record

12   of the 50-H Hearing of said witness;

13       That I am not connected by blood or

14   marriage with any of the parties; that I am

15   not interested directly or indirectly in the

16   outcome of this matter; that I am not in the

17   employ of any of the counsel.

18       In Witness Whereof, I have hereunto set my

19   hand this 7th day of November, 2011

20

21

22              -----------------

23              KARLA VALLARO

24

25
```

ORIGINAL

50-H HEARING                      015220

- - - - - - - - - x BLA: 2011PI031865

In the Matter of the Claim of

MINERVA VENTURA,

        Claimant,

     -against-

THE CITY OF NEW YORK, THE NEW YORK CITY POLICE

DEPARTMENT,

        Respondents.

- - - - - - - - - - - - - - x


    EXAMINATION of MINERVA VENTURA, the

Claimant, pursuant to Notice, held at the

offices of Shapiro, Beilly & Aronowitz, 225

Broadway, New York, New York, on October 26,

2011 at 3:02 p.m. before Karla Vallaro, a

Notary Public of the State of New York.



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REPORTER'S INK, CORP.

90 John Street, Suite 411

New York, New York  10038

(646) 395-2522

2

1

2                    A p p e a r a n c e s:

3        IRVING COHEN, ESQ.

                 Attorneys for Claimant
4                233 Broadway, Suite 2701

                 New York, NY 10271
5        BY:  IRVING COHEN, ESQ.

6

7

         SHAPIRO, BEILLY & ARONOWITZ, LLP
8                Attorneys for Respondents

                 225 Broadway, 13th Floor
9                New York, NY 10007

         BY:  DAVID MELTZER, ESQ.
10               FILE #: NYC-2350

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        M. VENTURA

2     MINERVA VENTURA, the witness herein, having

3     been first duly sworn by a Notary Public of

4     the State of New York, was examined and

5     testified as follows:

6     EXAMINATION BY

7     MR. MELTZER:

8     Q     Please state your name for the record.

9     A     **Minerva Ventura.**

10    Q     Where do you reside?

11    A     **1191 Reverend James Polite Avenue,**

12    **Bronx, New York 10459.**

13    Q     Good afternoon Ms. Ventura.  If you

14    don't hear me, let me know, okay?

15    A     **Okay.**

16    Q     My name is David Meltzer and I represent

17    the City of New York for this hearing.  I'll

18    be asking you some questions about an incident

19    that occurred involving New York City Police

20    Department.  I'll be asking you questions

21    about what happened at your arrest and I'll be

22    asking you questions about what happened while

23    you were in police custody.

24          If you don't understand my questions,

25    please let me know and I will try to reword it

4

```
 1                    M. VENTURA
 2    for you.  If you'd like one of my questions
 3    repeated, please let me know and the reporter
 4    can read the question back to you.
 5            I understand that sometimes you have
 6    difficulty hearing.  If you don't hear my
 7    question please let me know, okay?
 8    A     Okay.
 9    Q     What's your date of birth?
10    A     March 16, 1951.
11            MR. MELTZER:  In an off the record
12            stipulation entered into between the
13            attorneys, the claimant will be
14            providing me with her entire social
15            security number.  However, in the
16            interest the of privacy, only the last
17            four digits of the social security
18            number will be appear on the printed
19            transcript.
20    Q     What is your complete social security
21    number?
22    A     XXX-XX-7103.
23    Q     Are you currently receiving Medicare or
24    Medicaid benefits?
25    A     Medicaid, yes.
```

1                    **M. VENTURA**

2    Q      Do you receive it now?

3    **A**      **What.**

4    Q      Do you receive Medicaid benefits now?

5    **A**      **No, I have a plan.  Not Medicaid, no.**

6                 MR. COHEN:  Speak very slowly.

7    **A**      **Okay.**

8    Q      Have you ever sued the City or the State

9    of New York before this?

10   **A**      **If I --**

11   Q      Did you sue the city, did you bring a

12   legal action against the city before this

13   case?

14   **A**      **A legal action --**

15   Q      Yes.

16   **A**      **No, never.  First time.**

17   Q      Are you employed?

18   **A**      **Yes.  I'm a seamstress.**

19   Q      Who employs you?

20   **A**      **I'm a seamstress.**

21   Q      Do you work for a company?

22   **A**      **Yes.**

23   Q      What's the name of the company?

24   **A**      **I left my card in my jacket.  Morgana**

25   **Lee Factory.**

1                           M. VENTURA

2    Q      Morgana Lee?

3    **A      Morgana Lee Factory.**

4    Q      How long have you been working for

5    Morgana Lee?

6    **A      Two years.**

7    Q      Before your arrest, were there other

8    days that the police had come to your house

9    looking for someone?

10   **A      They come once, but I wasn't home when**

11   **they came.**

12   Q      How did you find out about it?

13   **A      My husband told me they came to look for**

14   **somebody.**

15   Q      Did he tell you anything else.  Was he

16   shown a picture of someone?

17   **A      He told me they showed him a picture.**

18   Q      Did your husband tell you that he knew

19   who that person was?

20   **A      How I --**

21   Q      Who was the photograph of?

22   **A      No, he told me they showed him a**

23   **picture, but he never had seen the person.**

24   Q      How did you find out that police had

25   entered your home on June 24, 2011?

```
 1                            M. VENTURA

 2      A      How did I find out.

 3      Q      Yes.

 4      A      I saw him come to the door, to my

 5      bedroom door and they were outside of the

 6      door.  I got up I felt like something happened

 7      downstairs.  The bedroom was on one flight up.

 8      The first floor.  The second floor.  I saw

 9      him.

10      Q      I think you're going to have to speak a

11      little slower.

12      A      Okay.

13      Q      Was your bedroom on the second floor?

14      A      Yes.

15      Q      Yes?

16      A      Yes.

17      Q      You heard a noise?

18      A      Yes.  I saw my husband go outside.

19      Q      Your husband went down?

20      A      Yes.

21      Q      When was your first time that you came

22      in to contact with the police that day?

23      A      I came downstairs behind him.

24      Q      What did you see?

25      A      I tried to go back to my bedroom to get
```

1                          **M. VENTURA**

2    **my hearing aide and the police come in.  Come,**

3    **come, they ordered me to sit.  Go sit down.**

4    Q       Did you see your husband being struck by

5    something?

6    **A       I went to the living room, he was**

7    **sitting down there bleeding.**

8    Q       Your husband was already seated and was

9    bleeding?

10   **A       Bleeding, yes.**

11   Q       Did you ask your husband what happened?

12   **A       I said what hit you.  He said my face.**

13   Q       When you went downstairs were you

14   dressed at that time?

15   **A       If I was --**

16   Q       Were you dressed, what were you wearing?

17   **A       My sleep robe.**

18   Q       How long did the police stay with you in

19   your apartment?

20   **A       I said what happened and they said sh,**

21   **sh.  Then later they showed me a picture.**

22   Q       They showed you a picture?

23   **A       Yes, later on.**

24   Q       Who did they show, who was on that

25   picture?

1                          M. VENTURA

2    A      It was a young man with braids.

3    Q      Did you know who that man was?

4    A      Did I what --

5    Q      Did you know who that man was?

6    A      No.   I never had seen him.

7    Q      Who showed you the picture of the man

8    with braids?

9    A      The police officer.   I'm not sure who,

10   some man.

11   Q      Did the police then take you to a police

12   precinct?

13   A      Did they --

14   Q      Did they take to you to a police

15   station?

16   A      Yes.

17   Q      At the police station were you

18   fingerprinted?

19   A      Fingerprinted.

20   Q      Yes?

21   A      Yes.   They took a long time, because it

22   didn't come out.

23   Q      Did they also photograph you?

24   A      Yes.

25   Q      Were you then put in a cell?

1                    M. VENTURA

2    A      Yes.

3    Q      Was that with your husband?

4    A      No, two separate.

5    Q      Was there anyone in the cell with you?

6    A      No, after me one lady come inside, but

7    she left early.

8    Q      While you were in the cell, did you

9    speak with any of the police officers?

10   A      No.  They were in plainclothes and they

11   were sitting right there.  Do you want water,

12   do you want to go bathroom.  That's all.

13   Q      They gave you water and they let you go

14   to the bathroom?

15   A      Yes, the bathroom.  Then later on I

16   wanted to go to the bathroom and nobody was

17   there.  I knocking at the door with my shoe.

18   Q      How long did you remain at the precinct

19   for?

20   A      How what?

21   Q      How long were you at the police station?

22   A      How.

23   Q      How long, how much time?

24   A      We were there until the morning.  Until

25   12:30-1:00.  Something like that and they took

11

1                           M. VENTURA

2      us to the court.

3      Q      When they took you from the precinct to

4      court, did they then put you in another cell?

5      **A      Yes.  And they took pictures again.**

6      Q      Did anyone either at the precinct or at

7      the other cell read you your rights?

8      **A      My rights?**

9      Q      Like you have the right to remain

10     silent?

11     **A      Did they read my rights?**

12     Q      Yes?

13     **A      No.**

14     Q      Were you ever shown a warrant to get

15     into your apartment?

16     **A      No.**

17     Q      When you were the court how many people

18     were in the cell with you?

19     **A      How many people, about six of them.**

20     Q      How long did you remain in that cell?

21     **A      How long.**

22     Q      Yes?

23     **A      Until 6:00-6:30.**

24     Q      Were you given anything to eat or drink?

25     **A      Any what?**

12

1                          M. VENTURA

2    Q      Were you given anything to eat?

3    A      **Yes, a sandwich.  With old bread.**

4    Q      Were you given anything to drink?

5    A      **No.**

6    Q      Did anyone hurt you in the cell in any

7    way?

8    A      **Any way.**

9    Q      Did anyone behave badly to you in the

10   cell?

11   A      **Did they do what?**

12   Q      Did they treat you badly in the cell.

13   Did anyone touch you improperly or say

14   anything improper to you?

15   A      **No.  I stay by myself, I avoided.  They**

16   **were strange people.**

17   Q      What happened at 6:30?

18   A      **They call me, come downstairs and wait**

19   **downstairs in another cell.**

20   Q      You were put in another cell?

21   A      **Yes.**

22   Q      How long were you in the other cell?

23   A      **I said can I have a paper, they said no**

24   **you're going home.  You don't need to see the**

25   **judge.**

1                     **M. VENTURA**

2    Q      When did you go out of the building.

3    What time?

4    **A      Before 7:00.**

5    Q      Before 7:00?

6    **A      I think so.  I don't remember.**

7    Q      Did they give you any paper or document

8    to show that you would be released?

9    **A      No.  I said you need to give me any**

10   **papers.  They said no, go home.**

11   Q      Did you sustain any physical injuries

12   where you had to see a doctor or a hospital

13   because of this?

14   **A      No.  They ask me do you want to go to**

15   **the hospital, because I have high blood**

16   **pressure.  You feel okay, you want to go to**

17   **the hospital, because if you go to the**

18   **hospital then they will be later with you for**

19   **the court.  I said, no, I'm okay.**

20   Q      Did you ever have to see a psychiatrist

21   or a psychologist or a mental health worker as

22   a result of this case?

23   **A      No.**

24   Q      Did you miss any time from work?

25   **A      If I what?**

14

1                    **M. VENTURA**

2    Q    Did you miss time from work?

3    **A    Yes, that day.**

4    Q    Were you paid for the day that you

5    missed?

6    **A    No, I get a one dress.  They pay one**

7    **dress.**

8              MR. MELTZER:  Okay.  I have no

9              other questions.  Thank you very much.

10             At this time I call for authorizations

11             to obtain any and all District Attorney

12             and or police records.

13             MR. COHEN:  We object.

14             MR. MELTZER:  Okay.

15             (Time noted 3:17 p.m.)

16

17

18

19

20

21

22

23

24

25

15

1               M. VENTURA

2          A C K N O W L E D G E M E N T

3          STATE OF NEW YORK)

4

5      I, Minerva Ventura, hereby certify that I

6  have read the transcript of my testimony taken

7  under oath in my 50-H Hearing of October 26,

8  2011, that the transcript is a true, complete

9  and correct record of what was asked, answered

10  and said during this 50-H Hearing, and that

11  the answers on the record as given by me are

12  true and correct.

13

14

15  _____

16

17

18          Signed and subscribed to

19          Before me, this _____ day

20          Of _____, _____

21          _____

22          Notary Public

23

24

25

16

1                                M. VENTURA

2                              I N D E X

3

WITNESS              EXAMINATION BY                PAGE

4

M. VENTURA        MR. MELTZER                   3

5

6              REQUESTS FOR PRODUCTION

7    DESCRIPTION                                PAGE

8    AUTHORIZATION FOR POLICE RECORDS          14

     AUTHORIZATION FOR D.A. RECORDS            14

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

17

1                          M. VENTURA

2                    C E R T I F I C A T E

3        I KARLA VALLARO, hereby certify that the

4   50-H Hearing of MINVERVA VENTURA was held

5   before me on the 26th day of October, 2011;

6   that said witness was duly sworn before the

7   commencement of the testimony; that the

8   testimony was taken stenographically by myself

9   and then transcribed by myself; that the party

10  was represented by counsel as appears herein;

11       That the within transcript is a true record

12  of the 50-H Hearing of said witness;

13       That I am not connected by blood or

14  marriage with any of the parties; that I am

15  not interested directly or indirectly in the

16  outcome of this matter; that I am not in the

17  employ of any of the counsel.

18       In Witness Whereof, I have hereunto set my

19  hand this 7th day of November,  2011

20

21                        _Karla Vallaro_

22                        ----------------

23                        KARLA VALLARO

24

25